523 A.2d 1003

Darlyn MORGAN

v.

Edward R. COHEN.

Wendy C. HOVERMILL

v.

Edward R. COHEN.

**Nos. 53, Sept. Term, 1986, 54 Sept. Term, 1986.**

Court of Appeals of Maryland.

April 7, 1987.

Motion for Reconsideration Denied
May 26, 1987.

Gary I. Strausberg (Gary L. Alexander, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., on brief), Baltimore, for Morgan.

Alfred L. Scanlan, Jr. (Whiteford, Taylor & Preston, on brief), Washington, D.C., Larry M. Waranch (Bryan D. Bolton and Shapiro & Olander, on brief), Baltimore, for Cohen.

Edward S. Digges, Jr., Jack L. Harvey and Digges, Wharton & Levin, on brief, for Motor Vehicle Mfrs. Ass'n of United States, Inc. and The Product Liability Advisory Council, Inc. and William H. Crabtree, Gen. Counsel and Edward P. Good, Sr. Atty., of Counsel, on brief for Motor Vehicle Mfrs. Ass'n of United States, Inc.

John J. Sellinger, Rockville, for Hovermill.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

ADKINS, Judge.

■ These two consolidated appeals present a common question: Whether a general release, executed in settlement of a damage claim against the operator of a motor vehicle whose negligence caused injury, also releases a physician who subsequently treats the injury. For the reasons set forth below, we hold that a general release of the original tortfeasor does not discharge the physician as a matter of law. The release of the physician depends on the intent of the parties, and where, as here, the releases are

ambiguous in this respect, summary judgment for the physician is precluded.

## I.

First, we recount the facts of the two cases.

### *Appeal No. 53—Morgan*

On 20 July 1980, appellant Darlyn Morgan was riding as a passenger on a motorcycle operated by Frank Armetta when it overturned. She was taken to Franklin Square Hospital where she was treated by appellee, Dr. Edward R. Cohen, an orthopedic surgeon, for a comminuted fracture of the left femur. According to Morgan's affidavit filed in opposition to Dr. Cohen's motion for summary judgment, Dr. Cohen operated on Morgan's leg, at which time he implanted an intermedullary rod. Following surgery Dr. Cohen told Morgan that the operation had been successful and that she would be able to walk in three to six months. Morgan was not, however, able to put weight on the injured leg. Thereafter Dr. Cohen informed her that "a second operation would be necessary to heal [her] leg injury." He performed the second operation in March of 1982, again claiming success and telling Morgan not to worry about her leg as "everything would be fine."

In June of 1982 Morgan settled her claim against Armetta and in consequence thereof executed a "RELEASE OF ALL CLAIMS." It provided, in relevant part, that Morgan did "release ... Frank Armetta and Puritan Insurance Company ... and all other persons ... of and from any and all claims, [and] damages which the undersigned now has ... or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries ... and the consequences thereof, resulting or to result from the accident" of 20 July 1980.

Approximately ten months later, Dr. Cohen informed Morgan that the operation had been unsuccessful and re-

ferred her to another physician who performed a third operation. The other physician was able to achieve union of the bone, enabling it to heal, but as a result of Dr. Cohen's negligent treatment, says the affidavit, Morgan's left leg is now two inches shorter than her right.

### Appeal No. 54—Hovermill

On 2 March 1979, appellant Wendy R. Hovermill, then a minor, was struck by an automobile operated by James Jones. She was treated by Dr. Cohen for a dislocation of her left hemipelvis. According to affidavits filed in opposition to Dr. Cohen's motion for summary judgment, Dr. Cohen ordered Hovermill to be placed in a pelvic sling, a form of traction. When x-rays showed the dislocation to be fundamentally reduced, Dr. Cohen discontinued traction and allowed Hovermill to walk. This caused an immediate redislocation of the pelvis with the result that Hovermill now has "a one-inch leg length discrepancy, a fused sacroiliac joint, an asymmetrical pelvis and a grossly deformed bony birth canal which is much reduced in size." According to the affidavit of a proposed expert witness the redislocation was caused by Dr. Cohen's discontinuance of traction at a "medically inappropriate" time.

Hovermill, as a minor acting through her mother, and her mother individually, brought suit against Jones. The suit was settled and an order of satisfaction signed directing the clerk to enter the case as "PAID, SETTLED AND SATISFIED." Pursuant to the settlement, Hovermill's mother executed a release which released "Jones ... and all other persons ... from any and all claims [and] damages ... of whatsoever kind or nature, and particularly on account of ... bodily injuries, known and unknown and which have resulted or may in the future develop, sustained by [Hovermill] in consequence of [the] accident...."

### The Cases Now Before Us

Morgan sued Dr. Cohen in the Circuit Court for Baltimore City. Hovermill sued him in the Circuit Court for Baltimore

County.[1] Both plaintiffs sought to recover for harm caused by allegedly negligent treatment of the injuries they had suffered in the motor vehicle accidents. In both cases the trial courts granted summary judgment for Dr. Cohen. In Morgan's case the decision was based solely on the release. In Hovermill's the trial court characterized the alleged negligent treatment as an aggravation of a single bodily injury and held that that single injury had been both satisfied and released. Both cases were appealed to the Court of Special Appeals; we granted certiorari while they were pending there.

## II.

Morgan and Hovermill urge :s to give retrospective effect to Code, Art. 79, § 13, as enacted by Chapter 379, 1986 Md.Laws.[2] They importune us to adopt the "modern rule" now often applied to releases of the kind before us.[3]

---

1. Each action was preceded by health claims arbitration in which Dr. Cohen prevailed.

2. Chapter 379, 1986 Md.Laws, effective 1 July 1986, added a new § 13 to Art. 79. It provides:
 "A release executed by a person who has sustained personal injuries does not discharge a subsequent tort-feasor who is not a party to the release and:
 (1) Whose responsibility for the injured person's injuries is unknown at the time of the execution of the release; or
 (2) Who is not specifically identified in the release."
 Morgan and Hovermill contend that this statute should be applied to their cases by virtue of the "fourth rule" in *Janda v. General Motors Corp.*, 237 Md. 161, 169–170, 205 A.2d 228, 233 (1964). In *Washington Suburban Sanitary Comm'n v. Riverdale Heights Vol. Fire Co., Inc.*, 308 Md. 556, 564, 520 A.2d 1319, 1323 (1987), we disapproved *Janda's* "fourth rule."

3. At one time, the majority rule was that a release of the original tortfeasor barred an action against a subsequent negligently treating physician. *See Trieschman v. Eaton*, 224 Md. 111, 115, 166 A.2d 892, 894 (1961); Annot., 40 A.L.R.2d 1075 (1955). Since that time, many courts have adopted a "modern rule" which in general states that absent clear language to that effect, the physician is not released, as a matter of law, by release of the original tortfeasor. *See, e.g., Williams v. Physicians & Surgeons Comm. Hosp.*, 249 Ga. 588, 292 S.E.2d 705

They claim that the harms inflicted by Dr. Cohen were separate from those inflicted by the original tortfeasors. Morgan argues estoppel. Additionally, both assert that the releases are ambiguous, so that parol evidence is admissible to determine the intent of the parties. Because we view this last issue as dispositive, we need not and do not address the others. But before we discuss this dispositive issue, some general background in this area of tort law will be helpful.

### III.

It is a general rule that a negligent actor is liable not only for harm that he directly causes but also for any additional harm resulting from normal efforts of third persons in rendering aid, irrespective of whether such acts are done in a proper or a negligent manner. *See* Restatement (Second) of Torts § 457 (1964); *see also Kyte v. McMillian,* 256 Md. 85, 259 A.2d 532 (1969) (rule recognized in *dicta* ). The reasoning behind this rule is that the original tortfeasor by his actions places the plaintiff in a position of danger and should be held accountable for the risks inherent in treatment and rendering aid.

When a physician negligently treats the injuries, he also becomes liable to the plaintiff, but only for the additional harm caused by his negligence. *See* Restatement (Second) of Torts § 433A comment c (1964); W. Prosser & W. Keeton, *The Law of Torts* § 52, at 352 (5th ed. 1984). Courts in general have correctly characterized the negligent treatment as a subsequent tort for which the original tortfeasor is jointly liable. *See, e.g., Trieschman v. Eaton,* 224 Md. 111, 115, 166 A.2d 892, 894 (1961) ("successive wrongdoers liable for the same harm"); *Williams v. Physicians & Surgeons Comm. Hosp.,* 249 Ga. 588, 292 S.E.2d 705 (1982); *Fieser v. St. Francis Hospital & School of Nursing,* 212 Kan. 35, 510 P.2d 145 (1973). This state of the law

---

(1982); *Fieser v. St. Francis Hospital & School of Nursing,* 212 Kan. 35, 510 P.2d 145 (1973); *see also* Annot., 39 A.L.R.3d 260, 264–65 (1971).

is conceptually clear enough, although it may produce difficult problems of proof because of the need of apportionment between the damages caused only by the negligent treatment and those caused by the original negligence. That particular difficulty is not before us now. What does concern us are problems created by failure to distinguish between jointly liable concurrent or successive tortfeasors on the one hand and true joint tortfeasors as they existed at common law.

As Dean Prosser has noted, careless analysis and statutory change have led to the confusion of jointly liable concurrent or successive tortfeasors with true "joint tortfeasors" at common law. *See* Prosser, *Joint Torts and Several Liability,* 25 Calif.L.Rev. 413 (1937). The early "joint tortfeasor" cases were limited to defendants who acted in concert, and the act of one was considered the act of all. Damages in those cases were entire; that is, each defendant was liable jointly and severally with the others for all of the damages. That is because there was but one wrong, though its commission was a joint enterprise, and therefore there was but a single cause of action. It is easy to see that a judgment against one joint tortfeasor would excuse the rest, because the judgment would extinguish the cause of action.

On the other hand, defendants who did not act in concert could not be joined, even though they had done identical acts that had combined to cause a single harm.[4] It was not until many states adopted Codes in the 19th Century that courts began to settle all claims connected with a transaction in a single suit, but not without much struggle and a good deal of confusion. *See* Prosser, 25 Calif.L.Rev. at

---

4. Prosser indicates that English courts had more or less adhered to this view up to the date of publication of his article, citing, *inter alia, The Koursk,* P. 140 (Scrutton, L.J., 1924), *Thompson v. London County Council,* 1 Q.B. 840 (1899), and *Sadler v. Great Western Ry. Co.,* A.C. 450 (1896). 25 Calif.L.Rev. at 414–15 n. 18. *But see* Prosser & Keeton, *Torts* § 48 at 330 n. 1 (5th ed. 1984) (English rule altered by statute in 1935 (25 & 26 Geo. V, ch. 30, § 6(1))).

415–17. The term "joint tortfeasor" became applicable to concurrent tortfeasors as well as those acting in concert. But as the rules of joinder gradually became flexible the common law notion of an identity of a cause of action continued to haunt the case law.

Furthermore, as these developments were taking place, [a]t the same time there developed a distinct principle, that the plaintiff was entitled to but one compensation for his loss, and that satisfaction of his claim, even by a stranger to the action, would prevent its further enforcement. It is obvious that this rule is equitable in its nature, and that its purpose is to prevent unjust enrichment. It is equally obvious that it applies not only to joint tort-feasors, but also to concurrent wrongdoers not acting in concert, or even to payments made by parties who have no connection with the tort at all.

*Id.* at 421–22 [footnotes omitted]. Prosser goes on to say:
There is a genuine distinction between a satisfaction and a release. A satisfaction is an acceptance of full compensation for the injury; a release is a surrender of the cause of action, which might be gratuitous, or given for inadequate consideration. Releases at common law were under seal. A release to one of two tort-feasors who had acted in concert necessarily released the other, since there was but one cause of action, which was surrendered. But as to independent wrongdoers, not acting in concert, who were liable for the same loss, there seems to be no reason to conclude that a release of one would release the others, except in so far as it was based upon actual satisfaction of the claim.

The American courts, doubtless because of the abolition of the seal, have rather hopelessly confused release with satisfaction. When, in turn, concurrent wrongdoers who have caused the same loss become "joint tort-feasors," the result is chaos.... [T]here are a substantial number of jurisdictions which hold that a release of one of two concurrent tort-feasors will release the other, even though it contains an express stipulation that he is not to

be released—and this without regard to the compensation actually received.

*Id.* at 422–24 [footnotes omitted].

Maryland was not immune to this common pitfall. An examination of the Maryland cases begins with *Cox v. Md. Elec. Rwys. Co.,* 126 Md. 300, 95 A. 43 (1915), which held that a full satisfaction, whether it came from a joint tortfeasor or one of several concurrent tortfeasors, discharged the others. The obvious purpose of the rule in *Cox* was to prevent double recovery. The source of the Court's finding of satisfaction was a docket entry to that effect in settlement of an action against a concurrent tortfeasor.

In *Lanasa v. Beggs,* 159 Md. 311, 151 A. 21 (1930), the Court extended the holding in *Cox.* A woman was injured when the taxicab in which she was a passenger collided with a truck at an uncontrolled intersection. Assuming both drivers were negligent, the torts would be concurrent, but not joint, at common law. The woman and her husband for consideration executed in favor of the cab company a covenant not to sue which reserved a right to proceed against the truck driver. The Court found a satisfaction in this covenant and barred suit against the "joint tortfeasor," using the following rationale:

The actions of the wife and her husband were to recover compensation for damages growing out of a single injury, although there was a plurality of tort-feasors. The amount of damages in each case was not apportionable among the wrongdoers, *as the cause of action was indivisible,* and the whole amount of damages was recoverable in these actions against the cab company....

Instead of awaiting the chance of verdicts in their favor and the assessment *in solido* of the amount of their damages, the wife and husband elected to take a certain amount for uncertain verdicts.... It follows that the payment made was not a partial but a complete discharge of the whole cause of action against the cab company. *And since this cause of action is an entire and indivisible cause of action, its full satisfaction by one of the*

*joint tort feasors is a complete satisfaction as to the other joint tort feasors....*

... The rule of this court is founded on the *indissoluble unity of a cause of action against joint tort-feasors.* No matter their number, the injury is entire and indivisible, and the injured party is entitled to but one compensation, whose amount is generally incalculable. It is, therefore, difficult to see how a settlement in full with one tort-feasor for an agreed compensation is not a discharge of the other.

159 Md. at 322–24, 151 A. at 26–27 [emphasis supplied; citations omitted].

*Lanasa* falls prey to the very confusion discerned by Prosser. *Cox* merely held that for purposes of preventing double recovery it was not necessary to distinguish between true joint tortfeasors and concurrent tortfeasors, subsequent tortfeasors, or volunteers for that matter. As the emphasized language indicates, *Lanasa* erroneously read *Cox* to extend the notion of a unity of action to concurrent tortfeasors as well. Moreover, *Lanasa* not only confused satisfaction with release, but also with a covenant not to sue.[5]

In *Trieschman* we criticized the ease with which our prior decisions found satisfaction. In our discussion of *Lanasa* we pointed out:

The experts in this field agree that the distinction between satisfaction in form and satisfaction in fact should be determined in every case and control the result.... "There is a genuine distinction between a satisfaction and a release. A satisfaction is an acceptance of full compensation for the injury; a release is a surrender

---

5. A dissenting opinion was filed in *Lanasa.* The dissenting judges emphasized the distinction between a covenant not to sue and a release. Apparently, had the plaintiff released the cab company, the dissenting judges would have agreed that there was satisfaction. *See* 159 Md. at 326–29, 151 A. at 28–29 (Offutt, J., dissenting).

of the cause of action. * * * Most of the courts have continued to hold that a release to one of two concurrent tortfeasors is a complete surrender of any cause of action against the other, without regard to the sufficiency of the compensation actually received. * * * This result has been justly condemned. * * * Historically, and logically, it has no justification, since causes of action against mere concurrent tortfeasors not acting in concert have always been separate * * * and a surrender of one therefore should not discharge the other, except to the extent that there has been full compensation. * * * The fear of double recovery is meaningless, since the amount paid under the release must be credited to the second tortfeasor in any case." [Prosser, *Torts* § 46 at 243–44 (2d ed. 1955) ].[6]

224 Md. at 116–17 n. 4, 166 A.2d at 895. *Lanasa* shows us that the expansion of the concept of joint tortfeasors may carry along with it rules that properly should apply only to tortfeasors acting in concert.

The Maryland version of the Uniform Contribution Among Tort-feasors Act (the Act), codified as Md.Code, Art. 50, §§ 16–24 (1957, 1986 Repl.Vol.), changed the rule of *Lanasa,* at least when the tortious conduct is concerted or the torts are concurrent. *See Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 476 A.2d 204 (1984); *Swigert v. Welk,* 213 Md. 613, 133 A.2d 428 (1957); *O'Keefe v. Baltimore Transit Co.,* 201 Md. 345, 94 A.2d 26 (1953). In *dicta* in *Trieschman,* we observed that the Act's definition of joint tortfeasors "literally embraces successive wrongdoers liable for the same harm even though one may be also liable to the injured person for additional damages." 224 Md. at 115, 166 A.2d at 894. We did not so hold in *Trieschman,* nor need we do so now. It is sufficient to note that the Act

---

**6.** For similar language, see Prosser & Keeton, *Torts* § 49 at 332–33 (5th ed. 1984).

abrogated the common law rule that the release of one joint tortfeasor releases all.[7]

In each of the cases before us there are two torts. The first is the original negligence for which the original tortfeasor alone is liable. The second is the negligent treatment by the physician, for which the physician and the original tortfeasor are jointly and severally liable. In one sense, those torts may be considered concurrent wrongs—both concur in producing the additional harm. In another, they may be seen as successive. The wrongs were committed at different times and each one gives rise to a separate cause of action. If the Act applies here, however, that is, if we deem both the original tortfeasors and Dr. Cohen to be within its definition of joint tortfeasor, by the very terms of the statute, Dr. Cohen is not released. Thus, if the Act is applicable, those to be released must be determined by the scope of the release itself, a matter of bargaining and drafting, and not by a rule of law that operates in spite of what the release says.

If the Act does not apply, we hold that the release of the original wrongdoer does not, of itself, produce the legal result of releasing the injured person's claims against the subsequent negligently treating physician. To the extent that *Lanasa,* or any other Maryland decision, holds to the contrary, that holding is overruled. The parties to a release, absent legislative restriction, ordinarily are free to expand or contract the scope of the instrument in accordance with their agreement. They should not have to fear that a court will later rule that a release of the original tortfeasor also released the physician by operation of law. *Compare* Restatement (Second) of Torts § 855(1) (1977) ("A valid release of one tortfeasor from liability for harm, given by the injured person, does not discharge others liable for the same harm, unless it is agreed that it will discharge

---

7. *See Loh v. Safeway Stores, Inc.,* 47 Md.App. 110, 422 A.2d 16 (1980). The Court of Special Appeals, in *Loh,* has interpreted the passage of the Act as limiting the applicability of *Lanasa* to instances where judgments have been satisfied. 47 Md.App. at 126, 422 A.2d at 26.

them") *with* Restatement of Torts § 885(1) (1939) ("A valid release of one tortfeasor from liability for a harm, given by the injured person, discharges all others liable for the same harm, unless the parties to the release agree that the release shall not discharge the others ...").

Accordingly, whether Dr. Cohen has been released depends on the terms of the particular releases now before us. It is to that subject that we now turn.

## IV.

■ Although the releases in question were broadly worded, neither named Dr. Cohen. So far as the record reveals, he did not contribute to the amount paid in exchange for each. Indeed, he was probably unaware of their existence until after the claims had been asserted against him. Against this background, we must look at the specific language of the releases, keeping in mind that the circumstances under which a contract is executed may be considered in deciding whether any of its terms are ambiguous. *Burroughs Corp. v. Chesapeake Petroleum & Supply Co.*, 282 Md. 406, 411, 384 A.2d 734, 737 (1978).

The Morgan document released Armetta (the original tortfeasor), his insurer "and all other persons ... of and from any and all claims, [and] damages which the undersigned now has ... or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries ... and the consequences thereof, *resulting or to result from the accident*" of 20 July 1982 [emphasis supplied].

Hovermill's release ran to Jones (the original tortfeasor) "and all other persons ... from any and all claims [and] damages ... of whatsoever kind or nature, and particularly on account of ... bodily injuries, known and unknown and which have resulted or may in the future develop, sustained by [Hovermill] *in consequence of [the] accident* ..." [emphasis supplied].

As a matter of syntax, one may argue that these releases could be construed to extend to an unknown tortfeasor, such as Dr. Cohen, for injuries arising out of a separate but related tort. But a contrary reading is permissible. What are released are claims for injuries "resulting from" or "sustained ... in consequence of" specific accidents caused by specific original tortfeasors on a particular date. The damages claimed by Morgan and Hovermill were not so caused. Phrases like "in consequence of" and "resulting from" are not technical legal terms; they should be read in their ordinary and literal sense. *See Kasten Constr. Co. v. Rod Enterprises*, 268 Md. 318, 301 A.2d 12 (1973). And they should be read in light of the circumstances that existed when the releases were executed. So read, the releases are ambiguous.

It is perfectly true that Dr. Cohen's alleged negligence followed, chronologically, the accidents. It is also true that "but for" the accidents, neither Morgan nor Hovermill would have been subjected to Dr. Cohen's ministrations. But in a very real sense the injuries purportedly inflicted by Dr. Cohen were not caused by the accidents. They were caused by his asserted negligence and produced separate and additional harms for which, as we have seen, he could be held independently liable, assuming proper proof. They were in a factual way separate harms, as argued by Morgan, and this is so despite the fact that the original tortfeasor might also have been held liable for them.

In short, it is arguable that what followed from Dr. Cohen's treatment was the result or consequence of that treatment, and not of the original accidents. Thus, although these releases may be unambiguous as to the original tort, they are at the very least ambiguous as to the subsequent tort and parol evidence is admissible on the issue of intent. This conclusion is fully consistent with the view that "inquiry focuses on the intention of the parties to the contract and not on knowledge gained subsequent to its execution...." *Bernstein v. Kapneck*, 290 Md. 452, 462, 430 A.2d 602, 608 (1981). What the parties did not know at

the time of execution may illuminate their intent at that time. This is not to suggest that we no longer derive intention "from the meaning that an individual would normally ascribe to the words chosen by the parties to memorialize their agreement." *Id.* It merely means that when those words in their ordinary sense under the circumstances are ambiguous, we may seek evidence of intent beyond the document. *Fieser v. St. Francis Hosp.*, 212 Kan. at 41–42, 510 P.2d at 151; *see also Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 488 A.2d 486 (1985) (insurance contract); *Burroughs*, 282 Md. 406, 384 A.2d 734.

Dr. Cohen relies on numerous Maryland general release cases that bar actions against concurrent tortfeasors, but they do not preclude our conclusion. In *Pemrock, Inc. v. Essco Co.*, 252 Md. 374, 249 A.2d 711 (1969), there was a single harm—the collapse of a poultry house in a storm. The release to the insurer certainly was unambiguous in releasing all others, including the house's designer and erector, who had contributed to that particular harm. The only harm involved resulted from or was the consequence of that event. And there were single harms in *White v. General Motors Corp.*, 541 F.Supp. 190 (D.Md.1982); *Stefan v. Chrysler Corp.*, 472 F.Supp. 262 (D.Md.1979), *aff'd without opinion*, 622 F.2d 587 (4th Cir.1980); *Peters v. Butler*, 253 Md. 7, 251 A.2d 600 (1969); *Thomas v. Erie Insurance Exchange*, 229 Md. 332, 182 A.2d 823 (1962); and *Ralkey v. Minnesota Mining & Manufacturing Co.*, 63 Md.App. 515, 492 A.2d 1358 (1985). None of those cases holds that a general release protects an unnamed subsequent tortfeasor who has caused additional injury or who has aggravated an initial injury by his subsequent independent negligence, when the subsequent negligent act was unknown when the release was signed. That is also true of *Bernstein v. Kapneck* where the claim held to be released was clearly the result of the original tort, although not known when the release was signed.

The conclusion that Morgan's release is ambiguous requires that the judgment against her in her case be

reversed and that the case be remanded for further proceedings. The similar conclusion in Hovermill's case does not end the inquiry, for Hovermill's matter presents an additional problem of satisfaction. That issue arises because suit had been brought against original tortfeasor Jones on behalf of Hovermill. Concomitantly with the delivery of Hovermill's release, judgment was entered against Jones, and that judgment was marked "satisfied."

In *Grantham v. Prince George's County*, 251 Md. 28, 246 A.2d 548 (1968), we held that when a judgment against one of several joint tortfeasor defendants had been entered "satisfied," the others were discharged. The tortfeasors there involved, it appears, were true joint tortfeasors in the common law sense; that is, the defendants had acted in concert to produce a single harm. *See* Prosser, 25 Calif.L. Rev. at 414. But the Court went on to suggest that the same result would follow even if concurrent or independent tortfeasors were involved. *Grantham*, 251 Md. at 39, 246 A.2d at 554. In reaching that conclusion, the Court relied on *Lanasa* and on *Cox*. The continued viability of *Cox* was questioned in *Trieschman*, 224 Md. at 118, 166 A.2d at 896. We have overruled *Lanasa* and any other Maryland decision that holds that a release of the original wrongdoer as a matter of law releases a negligently treating physician. This has the effect of overruling inconsistent portions of *Cox*. Thus, the *dicta* in *Grantham* relying on these overruled cases is unpersuasive.

 If releases given under the circumstances of these cases do not, as a matter of law, bar action against one in Dr. Cohen's position, it follows that the satisfaction of a judgment against Jones, the original tortfeasor, in an action to which Dr. Cohen was not a party, should have no greater effect. The policy implicated here is that against double recovery for the same harm, and it underlies the decisions in cases like *Grantham, Trieschman, Lanasa,* and *Cox*. *See also Huff v. Harbaugh*, 49 Md.App. 661, 670, 435 A.2d 108, 113 (1981). But the policy against double recovery does not apply when a judgment against the original tort-

feasor for the original tort only has been satisfied, at least when the subsequent tortfeasor has not been joined in that suit. *See* Restatement (Second) of Judgments § 50 (1982). Like the question of intent with respect to the ambiguous releases, we are presented with a question of fact: Did the satisfied judgment include damages for both torts, or just the original tort? If the judgment in fact encompassed the former, Hovermill's claim against Dr. Cohen is barred because she has received full compensation for all her injuries; if it encompassed only the latter, her claim is not barred because she has been compensated only for the initial harm caused by Jones. This is a question of fact for the trial court.

IN APPEAL NO. 53, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.

IN APPEAL NO. 54, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.

MURPHY, C.J., and RODOWSKY and McAULIFFE, JJ., dissent.

RODOWSKY, Judge, dissenting.

I join in the well reasoned analysis presented in Parts I, II, and III of the Court's opinion. I respectfully dissent from Part IV, however, because it is a *non sequitur.* In my view the petitioners have released their claims against the respondent.

As the Court recognizes in Parts I–III an original tortfeasor is not only liable for damages for the bodily harm initially caused solely by that tortfeasor's breach of duty, but, if there is negligent medical treatment, the original tortfeasor is also liable with the health care provider for

damages for any aggravation or exacerbation of that bodily harm. For example, if both tortfeasors were sued in one action and the jury valued the bodily harm caused exclusively by the initial tort at $10,000 and valued the aggravation of that harm by medical treatment at $20,000, the original tortfeasor would be liable for $30,000 damages and the physician would be jointly and severally liable for $20,000 of that amount. Judgment would be entered against the original tortfeasor and the physician, jointly and severally, for $20,000, and against the original tortfeasor alone for $10,-000.

Here the claims against the original tortfeasors and against the physician were asserted one after the other. That does not change the applicable law. It remains a matter of law that the wrong of the original tortfeasor is a proximate cause of the aggravation of the bodily harm also caused by the treating physician.

The heart of the majority's analysis in Part IV, where the subject releases are said to be ambiguous, rests on the words, "resulting from" and "in consequence of," as applied to the accidents specified in the respective releases. The majority says:

> But a contrary reading is permissible. What are released are claims for injuries "resulting from" or "sustained … in consequence of" specific accidents caused by specific original tortfeasors on a particular date. The damages claimed [against the physician] by Morgan and Hovermill were not so caused.

And further:

> In short, it is arguable that what followed from Dr. Cohen's treatment was the result or consequence of that treatment, and not of the original accidents.

Remarkably, the majority has managed to deny in Part IV what it took pains to affirm in Parts I–III, namely, that the law views the negligence of the original tortfeasor as concurring with any negligence of the physician in producing the enhanced injury. Consequently, a release of "all

other persons ... from ... all ... damages ... on account of ... bodily ... injuries ... resulting ... from," or "in consequence of," the motor vehicle accident is a release of the allegedly negligent physician because the damages for which the physician might be liable would be concurrently caused by the motor vehicle accident.

The majority's result-reaching has unfortunate effects on Maryland contract law. Consider the parol evidence rule ramifications of today's holding. These written contracts of release are the product of arms length bargaining. Morgan and Hovermill were each represented by counsel (who were other than their present appellate counsel). Hovermill was paid $49,000 for her release and Morgan was paid $20,000 for her release. The subject matter of the bargaining was tort claims. The words of causation used to limit the scope of the releases necessarily have the same meaning as proximate causation has in the law of torts. Indeed, Morgan, whose release contains an express integration clause, did not even present an ambiguity issue in her brief.

The majority cites *Kasten Construction Co. v. Rod Enterprises*, 268 Md. 318, 301 A.2d 12 (1973) to support its statement that "[p]hrases like 'in consequence of' and 'resulting from' are not technical legal terms; they should be read in their ordinary and literal sense." The squabble in *Kasten* concerned the extent of the obligations assumed by the purchaser of a partially completed real estate development under a written contract with the selling original developer. The contract called for assignment to the purchaser of an escrow fund to be used "for completion of all paving." The trial court in *Kasten*, based on evidence of pre-contract conversations and correspondence, concluded that the quoted words were ambiguous. This Court reversed, ruling that there was no ambiguity. *Kasten* involved a fluid fact situation that was unique to the contracting parties, particularly as to the state of completion of various phases of the real estate development. If parol evidence was excluded in *Kasten*, *a fortiori* it should be excluded here. The subject matter of the instant releases is

legal claims and the causation language of the releases has a definite meaning in law. *See* Parts I–III of the majority opinion.

Parties who make written contracts using language which carries a recognized legal meaning in the context of the subject matter and of their legal relationship have a right to expect that courts will honor that objective legal meaning. Yet, the majority remands these cases for further proceedings which presumably may include evidence on the meaning of "resulting from" and "in consequence of." Can anyone seriously think that there were prior or contemporaneous parol discussions about the meaning of those words in these particular releases? What the majority really has sanctioned are excursions into subjective intent and individual assumptions.

I would have affirmed the circuit court judgments. Chief Judge MURPHY and Judge McAULIFFE have authorized me to state that they join in this dissenting opinion.